Minute Order Form    (rev. 12/90)

## UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS

| Name of Assigned Judge or Magistrate Judge | JAMES F. HOLDERMAN | Sitting Judge if Other Than Assigned Judge | |
|---|---|---|---|
| Case Number | 99 C 877 | Date | April 18, 2000 |
| Case Title | CENTRAL STATES et al -v- STEEL EXPRESS INC. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd-party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1)    Filed motion of [use listing in "MOTION" box above]

(2)    Brief in support of motion due _____

(3)    Answer brief to motion due _____ Reply to answer brief due _____

(4)    ☐ Ruling / Hearing   on _____ set for _____ at _____

(5) **XX** Status hearing ☐ held ☐ continued to **XX** set for ☐ re-set for **11 MAY 00** at **10:00 am**

(6)    Pretrial conf. ☐ held ☐ continued to ☐ set for ☐ re-set for _____ at _____

(7)    Trial ☐ Set for ☐ re-set for _____ at _____

(8)    ☐ Bench Trial ☐ Jury Trial ☐ Hearing   held and continued to _____ at _____

(9)    This case is dismissed ☐ without ☐ with prejudice and without costs ☐ by agreement ☐ pursuant to
     ☐ FRCP 4(j) (failure to serve) ☐ General Rule 21 (want of prosecution) ☐ FRCP 41(a)(1) ☐ FRCP 41(a)(2)

(10) **XX** [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, plaintiff's motion for summary judgment is granted in part and denied in part.

(11) ☒ [For further detail see ☐ order on the reverse of ☒ order attached to the original minute order form.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | number of notices |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | APR 19 2000 | date docketed |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | docketing dpty. initials |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate Judge. | | date mailed notice |
| | courtroom deputy's Initials | Date/time received in central Clerk's Office   4-18-00 | mailing dpty. initials |

Document #

APR 19 2000
4-18-00

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CENTRAL STATES, SOUTHEAST and )
SOUTHWEST AREAS PENSION FUND )
and HOWARD MCDOUGALL, Trustee )
                                )
        and                     )
                                )
CENTRAL STATES, SOUTHEAST and   )
SOUTHWEST AREAS HEATH AND WELFARE )
FUND and HOWARD MCDOUGALL, Trustee )          No. 99 CV 877
                                )
        Plaintiffs,             )
                                )
        v.                      )
                                )
STEEL EXPRESS, INC.             )
                                )
        Defendant.              )
                                )

APR 19

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiffs Central States, Southeast and Southwest Areas Pension Fund and Southeast and

Southwest Areas Health and Welfare Fund and the Funds' trustee, Howard McDougall (collectively

"Central States") sued defendant Steel Express, Inc., seeking contributions for withdrawal liability

under § 515 of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1145. Central

States has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the

following reasons, Central States' motion is GRANTED IN PART and DENIED IN PART.

Plaintiffs Central States Pension and Health and Welfare Funds are employee benefit plans and trusts which are funded by contributions form multiple employers pursuant to negotiated collective bargaining agreements ("CBAs") with local unions affiliated with the International Brotherhood of Teamsters ("ITB"). The CBAs are negotiated on behalf of employees of the contributing employers, and the principal and income of the Funds are used for the purpose of providing pension and health and welfare benefits to participants and beneficiaries of Central States. Steel Express is an Indiana corporation, which, until the cessation of operations in April, 1999, provided regulated, for-hire transportation services in interstate and intrastate commerce.

## I. The Agreement

Steel Express signed a collective bargaining agreement with Local 142 of the ITB. The agreement is captioned the "National Master Freight Agreement and Central States Area Iron and Steel and Truckload Supplemental Agreement for the Period of April 1, 1991, through March 31, 1994" ("the NMFA"). Pursuant to the NMFA, Steel Express agreed to pay contributions to the Health and Welfare and Pension Funds on behalf of employees covered by the NMFA during the length of the Agreement.

As part of the parties' agreements, Steel Express agreed to be bound by both the Health and Welfare Fund and the Pension Fund Trust Agreements during the term of any collective bargaining agreement with Local 142, the last of which is the NMFA. Article 60, entitled "Health and Welfare Benefits" and 61, entitled "Pension Plan" of the NMFA provide as follows:

---

[1] The following statement of facts comes from the parties' Local Rule 56.1(a) 56.1(b) statements of material facts and accompanying exhibits.

By the execution of this Agreement, the Employer authorizes the appropriate Employer's association to enter into appropriate trust agreements necessary for the administration of such fund, and to designate the Employer Trustees under such agreement, hereby waiving all notice thereof and ratifying all actions already taken and to be taken by Trustees within the scope of their authority.

In administering the Health and Welfare and Pension Plan Funds, Central States relies upon participating employers to self-report the work history of eligible employees. Under the self-reporting system, participating employers initially establish a base group of employees for whom contributions are due. Thereafter, the employers are required to notify Central States on a monthly basis of any changes in the employment dates of individuals covered by the Agreement. Central States relies upon the reports submitted by employers to prepare monthly contribution bills. The monthly bills sent to employers by Central States list each of the employees of the employer on whose behalf contributions are being charged based upon the employer's reporting. The bill also lists all payments made by the employer. At all times since 1990, the reverse side of Central States' monthly bills has contained a "certification clause" which provides that the employer reaffirms his obligations to make contributions required by the Collective Bargaining Agreement, that all employees eligible to participate in the Fund are being reported, and only those eligible employees are being reported.

Central States assumes that there has been no change in the covered workforce from month-to-month and continues to bill for the same employees every month, unless the employer notifies Central States of a change in the employment status of the individuals listed on the bill. When establishing the contribution rates necessary to support benefit levels, the Pension and Health and Welfare Funds rely upon cost estimates of actuaries. In making the calculations, the actuaries assume the employers are complying with the rules, and that some participants will never have benefits paid on their behalf

3

because the benefits will never vest or because the participants remain healthy and thus have less expensive costs than other employees. The contributions paid on behalf of those employees who do not vest and/or have lower than average health and welfare claims are necessary to support the level of benefits provided to other employees.

Article III, Section 1 of the Central States' trust agreement provides that employers shall remit continuing and prompt contributions to the Trust Fund as required by the applicable collective bargaining agreement to which the employer is a party. The trust agreement also provides that the obligation to make such contributions shall continue during periods when the collective bargaining agreement is being negotiated, but not during periods of strike after contract termination.

II.     Duration of the NMFA

The parties agree that Steel Express was bound by the NMFA until at least March 31, 1994. Article 39 of the NMFA provides:

> Section 1.
> This Agreement shall be in full force and effect from April 1, 1991 to and including March 31, 1994 and shall continue year-to-year thereafter unless written notice of a desire to cancel or terminate this Agreement is served by either party upon the other at least sixty (60) days prior to the date of expiration.
>
> When notice of cancellation or termination is given under this Section, the Employer and the Union shall continue to observe all terms of this Agreement until impasse is reached in negotiations, or until either the Employer or the Union exercise their rights under Section 3 of this Article.
>
> Section 2.
> Where no such cancellation or termination notice is served and the parties desire to continue said Agreement but also desire to negotiate changes or revisions in this Agreement, either party may serve upon the other a notice at least sixty (60) days prior to March 31, 1994 or March 31st of any subsequent contract year, advising that such party desires to revise or change the terms or conditions of such Agreement.

On October 25, 1993, more than 60 days before March 31, 1994, Local 142 served a letter on

4

Steel Express which stated, in pertinent part:

> YOU ARE HEREBY NOTIFIED that the Teamsters National Freight Industry Negotiating Committee and the undersigned Local Union, as a bargaining agent for the involved employees, desire to revise or change terms or condition of the NATIONAL MASTER FREIGHT AGREEMENT and all AREA, REGIONAL and LOCAL SUPPLEMENTS, ADDENDA and APPENDICES thereto, including separate Freight Agreements, for the next contract period as provided in Article 39, Section 2, thereof, or applicable Article of an approved separate Agreement.

In conjunction with that letter, Local 142 also sent a notice of a proposed termination or modification to the existing Agreement to the Federal Mediation and Conciliation Service. Other than the October 1993 letter, no other notices were exchanged by Steel Express or Local 142 under Article 39 of the NMFA.

A Central States' computer record dated September 29, 1994 reflects the expiration date for the NMFA as "03/31/94," but shows the contract status as "active." Another Central States document dated August 20, 1996, (referring to the NMFA) states "contract expired 3-31-94."

At all times since 1990, the reverse side of Central States' monthly bills contained a "certification clause" which provides that the employer reaffirms his obligations to make contributions required by the Collective Bargaining Agreement that all employees eligible to participate in the Fund are being reported and only those eligible employees are being reported. Each month from December, 1993 through February, 1996, Central States submitted a bill to Steel Express that contained the certification clause. During that same period, Steel Express responded to each of the bills by remitting contributions to Central States on behalf of one employee.

In March of 1996, Steel Express completed and returned to Central States the "Employee Billing Changes and Corrections" portion of the bill Central States had sent for February, 1996. The

information provided by Steel Express indicated that as of January 28, 1996, the only employee included on the bill was ineligible for contributions because he was on unpaid sick leave. Steel Express signed the February, 1996 bill immediately below the certification clause. Because Steel Express advised Central States that the only reported employee was ineligible for contributions, Central States stopped billing Steel Express for monthly contributions.

In 1998, Steel Express completed a Statement of Business Affairs ("SBA") sent to it by the Pension Fund in connection with the Fund's investigation to determine whether withdraw liability was due. In the SBA, Steel Express advised the Pension Fund that it "ceased to be obligated to make contributions to the Fund under its collective bargaining agreement" on February 14, 1996. Steel Express further indicated that it had ceased contributing to the Fund because its one "covered" employee was on sick leave and was thus no longer eligible to receive contributions.

III.     Workers Covered by the NMFA

Article 40, Section 2 of the NMFA provides: "Employees covered by this agreement shall be construed to mean any driver, chauffeur, or driver-helper operating a truck, tractor, motorcycle, passenger or horse-drawn vehicle." The agreement covers not only direct employees of Steel Express who drove trucks owned by Steel Express, but also some "owner-operators." Owner-operators include any employee driver who performs unit work and who operates trucking equipment which he owns and leases to Steel Express. NMFA Article 22, Section 2. Under that section, owner-operators are required to hold the certificate and title to the leased equipment in their own names.

Under Article 22, Section 1, the parties recognized the distinction between "employee owner-operators," who are covered by the Agreement, and "non-employee owner-operators," who are not covered. Section 1 states:

6

Generally, employee owner-operators are drivers who work exclusively for a single employer on a regular basis and who perform the same type of work as the Employer's regular employee drivers, and it is only that kind of owner-operator who is covered this Article. Conversely, there are owner-operators who do hauling work on an intermittent basis (i.e. trip leases) for several different Employers. As such, the latter may be utilized only to perform work which may be properly subcontracted under Article 32 (e.g., overflow loads).[2]

Under Article 22, Section 3, the employer reserved "the right to control the manner, means and details of, and by which, the [employee] owner-operator performs his services, as well as the ends to be accomplished." The NMFA provided that "[a]ll employee owner-operators shall be treated under the provisions of this Agreement and any applicable supplements to this Agreement, in the same manner as other employee drivers." Article 22, Section 3. Thus, under the NMFA, employee owner-operators were entitled to all of the benefits of being employees, including the withholding of state and federal taxes from their wages, payment of the employer share of FICA taxes, worker's compensation coverage, and unemployment insurance.

Steel Express did not own any of its own equipment during the audited period of December 26, 1993 to December 28, 1996, and thus none of its drivers drove Steel Express equipment. Rather, Steel Express leased equipment and drivers from a variety of sources, including fleet owners and owner-operators. Fleet operators own equipment and employ drivers, and then lease the equipment and drivers to for-hire motor carriers, such as Steel Express.

---

[2] Article 32 provides that the employer may subcontract work to various entities, including "non-employee owner-operators" only under limited conditions. NMFA Article 32, Section 1. Those conditions include "when all of his regular employees are working, except that in no event shall road work presently performed or runs established during the life of this Agreement be farmed out." NMFA Article 32, Section 3. Overflow loads are also allowed to be delivered pursuant to Article 29 of the Agreement.

7

Under the NMFA, when an employer leased trucks from its employee owner-operators, "separate checks shall be issued by the [employer] for drivers' wages and equipment rental." NMFA Article 56, Section 6. Central States paid some of its owner-operators under this "two check" system, and payments to them were reported to the IRS on IRS W-2 forms. Employees paid in this manner were commonly referred to as "two checkers." Central States paid other owner-operators with a single check and reported payments to them on IRS 1099 forms for self-employed individuals. According the Central States, the single check represented payment to the owner-operator for the lease of the equipment and driver to Central States. Steel Express did not withhold state or local income taxes or FICA taxes from payments made to those owner-operators. Steel Express allowed drivers to choose whether they wanted to receive two checks and be treated as employees or to receive one check and be treated as independent contractors.

Steel Express classifies those owner-operators who received only one check as "independent contractors." Those "independent contractors," according to Steel Express, leased their equipment to Steel Express on a permanent or trip lease basis. "Permanent" leases are for a period of 30 days or more; trip leases are for a load-by-load time period, although trip leases can be utilized successively over a period of time. These "independent contractors," like all owner-operators, maintained their own equipment, were responsible for all costs of operating it, bore the risk of loss of damage, and were responsible for insuring the equipment. The "independent contractors" had the right to refuse loads or not to work, could work for other carriers, and did not have to wear uniforms. Steel Express did not control the method and manner by which the "independent contractors" operated equipment or hauled loads. They did not receive any benefits such as sick or vacation leave, unemployment insurance, and fringe benefits that employees of Steel Express received. They

8

assumed entrepreneurial risk, and had the potential to realize a profit or loss from their business. However, all owner-operators signed the same lease with Central States.

According to Steel Express, "independent contractor" owner-operators hauled for Steel Express on a non-exclusive and intermittent basis. The projects varied in time from several days to several months, during which time they were free to work for other carriers. Steel Express maintains that these "independent contractors" were not covered by the NMFA or any other collective bargaining agreement with Local 142.

IV.    Amount of Liability

In order to verify the accuracy and completeness of the work history reported by participating employers, Central States is authorized to perform payroll audits of the employer's records. Prior to 1997, Central States had never audited Steel Express. However, in 1997, the Pension and Health and Welfare Funds audited Steel Express' records to verify the accuracy and completeness of the employee work history reported to the Pension and Health and Welfare Funds for the period of December 23, 1993 through December 28, 1996. Steel Express did not object to the audit and provided Steel Express access to the records requested by Central States for the audit period.

As a result of the audit, Central States made a claim for delinquent payments for the audit period. The parties dispute whether the NMFA was in effect during the audit period, the number of employees for whom contributions were due, and the proper contribution rates for any covered employees.

The parties do not dispute the number (nineteen), names, or dates of employment of drivers who worked as employees of Steel Express during the audit period. The parties agree that, if the NMFA was in effect for the audit period, contributions would be due on behalf of those employees.

Instead, Steel Express maintains that no contributions were due on behalf of those employees because the NMFA expired on March 31, 1994.

Steel Express classifies another three drivers as having been permanently leased to them during the audit period. The parties do not dispute the names and dates of employment for those drivers. Steel Express maintains that, even if the NMFA was still in effect after March 31, 1994, no contributions are due on behalf of those drivers because they were "independent contractors."

Steel Express classifies fourteen drivers as having worked as "trip lessors" during the audit period. The parties do not dispute the names and periods of employment for those drivers. Steel Express denies that contributions are due on behalf of those drivers because they were independent contractors and did not work on a regular basis for Steel Express. Steel Express maintains that those workers are not covered by the NMFA because they leased their equipment, with driver, to other motor carriers during the same time periods.

Steel Express also disputes the amount of contributions due on behalf of any employees for whom contributions are due. In calculating the contributions due from the audit period, Central States used the contribution rates from a new NMFA which covered the period of April 1, 1994 to March 31, 1998, which Steel Express never signed. Steel Express maintains that the contribution rates which were in effect on March 31, 1994 are the correct rates, because the NMFA expired at that time and Steel Express never agreed to the new, higher rates. Central States signed two Interim Agreements with the Health and Welfare Fund in which it agreed to pay higher rates. The first agreement had an effective date of April 1, 1994, and stated the new contribution rate as $121.70. The second agreement had an effective date of April 1, 1995, and stated a contribution rate of $131.70.

The Pension and Health and Welfare Trust Fund Agreements both provide that the employer shall be obligated to pay interest on any contributions, withdrawal liability, or other moneys due to the Trustees from the date when the payment was due to the date when the payment is made, together with all expenses of collection incurred by the Trustees. The annual interest rate is equal to two percent plus the prime interest rate established by Chase Manhattan Bank for the 15th day of the month for which the interest is charged. Any judgment against the employer for contributions or withdraw liability "shall include the greater of (a) a doubling of the interest computed and charged in accordance with this section or (b) single interest computed and charged . . . plus liquidated damages in the amount of 20% of the unpaid contributions or withdraw liability." The interest rate after entry of a judgment begins to accrue on the date of judgment at the same interest rate.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1996). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 106 S. Ct. 2548,

2553 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S. Ct. at 2511.

ANALYSIS

I.    Duration of the NMFA

The first issue that the parties dispute is when Steel Express ceased to be obligated to make contributions to Central States on behalf of employees covered by the NMFA. It is undisputed that the NMFA covered the period from April 1, 1991 to and including March 31, 1994. It is also undisputed that Steel Express terminated the NMFA effective March 31, 1998, if the NMFA had not expired previously. Central States maintains that the NMFA continued in effect after March 31, 1994, and that Steel Express' contract termination claim is not available under ERISA. Steel Express argues that the NMFA expired on March 31, 1994 by its own terms, and that any conributions due after that time were post-contractual obligations controlled by the National Labor Relations Act ("NLRA").

As explained above, Section 1 of the NMFA contained an "evergreen clause," which provided:

> This Agreement shall be in full force and effect from April 1, 1991 to and including March 31, 1994 and shall continue year-to-year thereafter unless written notice of a desire to cancel or terminate this Agreement is served by either party upon the other at least sixty (60) days prior to the date of expiration.
>
> When notice of cancellation or termination is given under this Section, the Employer and the Union shall continue to observe all terms of this Agreement until impasse is reached in negotiations, or until either the Employer or the Union exercise their rights under Section 3 of this Article.

Section 2 of the NMFA further provided:

> Where no such cancellation or termination notice is served and the parties desire to

12

continue said Agreement but also desire to negotiate changes or revisions in this Agreement, either party may serve upon the other a notice at least sixty (60) days prior to March 31, 1994 or March 31st of any subsequent contract year, advising that such party desires to revise or change the terms or conditions of such Agreement.

Steel Express argues that Local 142's October 25, 1993 notice of its desire to revise or change terms or condition of the NMFA prevented the evergreen clause from taking effect by law, such that the NMFA expired on March 31, 1994. Steel Express reads the notice of a desire to modify as a notice of a desire to terminate, thus preventing the evergreen clause from taking effect. Central States counters that, under the plain language of the NMFA, absent a notice to cancel or terminate, the contract continued in effect beyond the March 31, 1994 expiration date. Because the October, 1993 notice stated a desire to negotiate revisions and changes to the contract, not to terminate, Central States argues, the evergreen clause did take effect, and the contract continued from year to year for the period after March 31, 1994.

This court finds that the contract did continue in force after March 31, 1994, and that Steel Express' contract termination defense is thus not available. The plain language of the NMFA provides that it "shall continue from year to year" after March 31, 1994, unless written notice of a desire to cancel or terminate was served by either party. The October, 1993 notice cannot reasonably be read as notice of a desire to terminate. As such, the evergreen clause took effect on March 31, 1994. The cases relied upon by Steel Express for the proposition that notice of a desire to modify a CBA should be read to prevent the operation of an evergreen clause are inapposite. In those cases, the CBAs provided that notification of a desire to terminate or modify affected the duration of the agreement. Here, only notice of a desire to terminate prevents the operation of the evergreen clause. Notice of a desire to modify the agreement, on the other hand, had no legal effect on the operation

of the NMFA.

Because the contract did not "expire by its own terms," Central States could escape liability only by demonstrating that the NMFA was terminated. However, contract termination is not a defense under § 515 of ERISA. See Carpenters Health & Welfare Trust v. Bla-Delco Constr., Inc., 8 F.3d 1365, 1369 (9th Cir. 1993). The Seventh Circuit first noted in Gerber Truck that pension trusts are generally not parties to collective bargaining and pension contribution agreements, but stand in the position of third-party beneficiaries to them. Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Servs., Inc., 870 F.2d 1148, 1151 (7th Cir. 1989); see also Bla-Delco, 8 F.3d at 1369. However, unlike most third-party beneficiaries, pension trusts do not take contracts as they find them. Gerber Truck, 870 F.2d at 1151. "Congress and the courts have restricted the availability of contract defenses in trust fund collection actions because 'millions of workers depend upon the employee benefit trust funds for their retirement security." Bla-Delco, 8 F.3d at 1369. In a trust fund collection action, if the employer simply points to a defect in the formation of the contribution agreement--such as fraud in the inducement, illegality, oral promises to disregard the text, effective termination or a lack of majority support for the union and the consequent ineffectiveness of the pact under the labor law--the employer is still bound by its promise to the pension trusts. See Gerber Truck, 870 F.2d at 1153; see also, Bla-Delco, 8 F.3d at 1369.

Moreover, even if the contract termination defense was available to Steel Express, Steel Express has offered no evidence that the NMFA was terminated at any time prior to March 31, 1998. Steel Express points to two Central States documents which Steel Express argues reflect Central States' understanding that the NMFA had terminated on March 31, 1994. The first document is a computer record dated September 24, 1994 which indicates the NMFA's expiration date as March

14

31, 1994. However, the expiration date is entered without regard to whether there was an evergreen clause, and the same record indicates the contract's status as "active." The other document was made by a low level Central States' employee without any management power to terminate the contract. Furthermore, even if those documents unambiguously demonstrated that Central States believed the NMFA had expired, that would not mean that the contract had, in fact, expired. One party to a contract's belief that the contract has terminated does not make it so. Lastly, any characterization of the contract as expired as of March 31, 1994, is not inconsistent with Central States' argument that the initial term of the NMFA expired on March 31, 1994, but then was renewed year to year thereafter.

That the NMFA continued in force beyond March 31, 1994 is unambiguously reinforced by the certification clause which Steel Express signed on Central States' bills each month after March 31, 1994. That certification clause stated: "The employer hereby reaffirms his obligation to make contributions required by the Collective Bargaining Agreement . . . ." Central States argues that by signing the certification clause, it merely acknowledged its obligation to continue post-contractual payments under the NRLA, not contractual payments under the NMFA. However, under the plain language of the certification clause, Central States repeatedly acknowledged its obligation to continue payments under the operative collective bargaining agreement, the NMFA.

Because the undisputed facts demonstrate that Steel Express remained bound my the NMFA beyond March 31, 1994, this court finds that partial summary judgment for Central States is appropriate on this issue. Thus, contributions are due for all drivers covered by the NMFA during the audit period.

II.    Amount of Liability

Having determined that, based on the undisputed facts, the NMFA continued beyond March 31, 1994, this court turns to the amount of contributions due from Steel Express. The parties disagree both as to the number of employees on whose behalf contributions are due and the rates for those contributions.

A.  Drivers for Whom Contribution is Due

Steel Express had several categories of drivers, at least some of whom they admit were "employee owner-operators" covered by the NMFA. However, Steel Express disputes that contributions are due for those drivers whom they classified as independent contractors. This court finds that there are some genuine issues of material fact as to which Steel Express employees are covered by the NMFA, and grants only partial summary judgment on this issue.

The NMFA recognizes a distinction between "employee owner-operators," who are covered by the Agreement, and "non-employee owner-operators," who are not covered. Owner-operators include any employee driver who performs unit work and who operates trucking equipment which he owns and leases to Steel Express. NMFA Article 22, Section 2. Article 22, Section 1 of the NMFA explains the distinction:

> Generally, employee owner-operators are drivers who work exclusively for a single employer on a regular basis and who perform the same type of work as the Employer's regular employee drivers, and it is only that kind of owner-operator who is covered this Article. Conversely, there are owner-operators who do hauling work on an intermittent basis (i.e. trip leases) for several different Employers. As such, the latter may be utilized only to perform work which may be properly subcontracted under Article 32 (e.g., overflow loads).[3]

---

[3]As explained above, Article 32 provides that the employer may subcontract work to various entities, including "non-employee owner-operators" only under limited conditions. NMFA Article 32, Section 1. Those conditions include "when all of his regular employees are working, except that in no event shall road work presently performed or runs established during the life of this Agreement

Under Section 3, the employer reserved "the right to control the manner, means and details of, and by which, the [employee] owner-operator performs his services, as well as the ends to be accomplished." NMFA Article 22, Section 3. As such, under the NMFA, contributions are due on behalf those drivers who worked "on a regular basis," performed "the same type of work as the [Steel Express'] regular employee drivers," and the manner, means, and details of whose work Steel Express had the right to control. However, contributions are not due on behalf of those drivers who did hauling work "on an intermittent basis (i.e. trip leases) for several different Employers," and whom could be properly subcontracted under Article 32.

      1.    <u>"Employee Owner-Operators"</u>

Steel Express has identified a group of drivers whom it classified as employee owner-operators during the audit period. This group of employees were paid two checks and opted to be treated as employees. Steel Express concedes that contributions are due on behalf of those employees for the period January 1, 1994 to Mach 31, 1994. Steel Express only objects to the contributions for those employees after March 31, 1994, when Steel Express contends the NMFA expired. In light of this court's ruling that Steel Express remained obligated to contribute to the Funds after March 31, 1994, there is no genuine dispute that Steel Express is liable to Central States for contributions due for those drivers whom Steel Express classified as employees, the "two-checkers."[4] Accordingly, summary judgment is appropriate as to Steel Express' liability for those

---

be farmed out." NMFA Article 32, Section 3. Overflow loads are also allowed to be delivered pursuant to Article 29 of the Agreement.

    [4]Steel Express disputed only one employee owner-operator in Central States' calculation of the amount owed on behalf of those employees. Steel Express stated that D. Djinovich was an

drivers.

## 2. "Permanently" Leased Drivers and Trip Lessors

Steel Express classifies three drivers as having been "permanently leased" to Steel Express and fourteen drivers as having worked as "trip lessors" during the audit period. Both of these groups of drivers opted to be treated as independent contractors and receive one check. Steel Express classifies both these groups of drivers as "independent contractors" for whom no contributions are due because they are not covered by the NMFA. Steel Express argues that it is in fact forbidden from making contributions on behalf of those drivers because the Labor Management Relations Act ("LMRA") and the Plan documents forbid payments made on behalf of self-employed individuals. Central States counters that Steel Express may not escape liability simply by labeling these drivers as independent contractors. Rather, Central States argues, the evidence shows that those drivers worked for Steel Express on a regular and continuous basis and were treated like "regular" employees, regardless of the manner in which they paid, and thus contributions are due on their behalf.

First, this court addresses Steel Express' argument that it is forbidden by law from making contributions to those drivers whom it designated as independent contractors. Section 302(a)(1) of the LMRA prohibits payments by employers to "any representative of any of his employees . . ." 29 U.S.C. § 186(a)(1). Section 302(c)(5) provides an exception for certain payments to trust funds created by such representatives "for the sole and exclusive benefit of the employees of such

----

employee in 1995, not 1996 as asserted by Central States. However, Central States got the date information for the employees from Steel Express' answers to interrogatories, and Steel Express offered no evidence to refute the date. Moreover, contribution is due on behalf of that employee, regardless of the year in which he worked.

employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents) . . ." 29 U.S.C. § 186(c)(5). These provisions prohibit payments by employers to employee trust funds on behalf of, or for the benefit of, anyone ineligible to receive benefits from those funds. Walsh v. Schlecht, 429 U.S. 401, 407, 97 S.Ct. 679, 684 (1977). The LMRA excludes any person having the status of independent contractor from the statutory definition of "employee," 29 U.S.C. § § 142(3) and 152(3), and common law agency principals are used to distinguish between employees and independent contractors under the Act. Nationwide Mutual Ins. Co. V. Darden, 503 U.S. 318, 325, 112 S.Ct. 1344, 1349 (1992). Steel Express argues that it would have been illegal under § 302 of the LMRA for it to make contributions to the Funds pursuant to the NMFA based on work performed by any of its owner-operators who were self-employed independent contractors.

Central States responds by arguing that, under Illinois Conference of Teamsters & Employers Welfare Fund v. Mrowicki, 44 F.3d 451 (7th Cir. 1994), contributions to the Funds would not be illegal because the Funds seek only contributions on behalf of the drivers, and would not pay corresponding benefits to the independent contractors. Central States' argument on this point is misplaced. Mrowicki was specifically decided on the fact that the collective bargaining agreement in that case required contributions "based on the numbers of hours worked by individuals who . . . were not employees under the common law definition and who would be ineligible to receive benefits from the Fund." The court noted that the agreement did not specify that the payments were to be made "on behalf of" or "for the benefit of" every individual whose hours of work formed the basis of the payments. Id. at 461. Here, by contrast, Central States' own statement of undisputed fact ¶ 10 and ¶ 11 state: "Pursuant to the NMFA, Steel Express agreed to pay contributions to the

[Health and Welfare and Pension] Fund[s] <u>on behalf of</u> employees covered by the NMFA." Unlike in <u>Mrowicki</u>, the level of contributions sought by Central States was not determined by the number of hours worked by non-employees who were not eligible to receive benefits. Here, Central States seeks contributions on behalf of drivers, even if those drivers are not eligible to receive benefits, not contributions measured by the number of hours worked by drivers who are ineligible to receive the benefits. Under the NMFA, there are no drivers whose work hours determine contributions owed to Central States who are not otherwise "covered employees." As such, this court finds that the LMRA forbids Steel Express from making any contributions to the Funds on behalf of drivers who are not also eligible to receive benefits.

It is undisputed that those employees whom Steel Express treated as independent contractors did not receive any fringe benefits. However, neither party addressed whether those drivers were <u>eligible</u> to receive benefits. Central States appears to want to have its cake and eat it too, asking this court to find that contributions are due on behalf of drivers to whom it owes no potential corresponding duty to pay benefits. However, the plain language of the NMFA does not permit such an interpretation; contributions are due only "on behalf of" employees covered by the NMFA. Thus, if Central States later seeks to prove that any of these "independent contractors" were covered by the NMFA, Central States will be required to concede that those drivers were eligible for benefits.

As explained, Steel Express cannot be required to make contributions on behalf of drivers who truly were "independent contractors" not covered by the NMFA. However, that victory does not relieve Steel Express as to all the truckers that it has classified as "permanently leased" and "trip lessors." Steel Express cannot avoid liability on those drivers merely by labeling them as independent contractors. The plain language of the NMFA states that whether owner-operators are

covered by the NMFA (thus requiring Steel Express to make contributions on their behalf), is to be determined by the nature and frequency of the work they performed, not their title as "employee owner-operator" or "independent contractor owner-operator." In other words, there may be drivers on whose behalf Steel Express owes contributions, despite the fact that Steel Express, (or even the drivers themselves) considered them to be independent contractors. Whether contributions are due on behalf of those drivers are questions of fact, which, as explained more fully below, this court cannot resolve based on the undisputed facts.

### a. "Permanently Leased" Drivers

Steel Express classifies three employees as having been "permanently leased" to them during the audit period. At first glance, it appears that the plain language of the NMFA covers the "permanently leased" drivers. A common sense understanding of the word "permanent" suggests that the drivers worked for Steel Express "on a regular basis," not "on an intermittent basis (i.e. trip leases) for several different Employers." However, the NMFA definition of "permanent" leases is not inconsistent with working "on an intermittent basis." "Permanent" leases are as short as 30 days, and are contrasted with trip leases, which are for a load-by-load time period, although trip leases can be utilized successively over a period of time. As such, this court finds that there is a factual dispute as to whether these "permanently" leased drivers worked "on a regular basis," performed "the same type of work as the Employer's regular employee drivers," and could be controlled in the manner of their work, or rather whether they worked "on an intermittent basis (i.e. trip leases) for several different Employers," and could be properly subcontracted under Article 32.

### b. "Trip Lessors"

Steel Express classifies fourteen employees as having worked as "trip lessors" during the

audit period. Trip leases are for a load-by-load time period, but can be utilized successively over a period of time. Central States counters this classification with Steel Express records which allegedly reflect that the drivers worked "week after week" for Steel Express. Even if this court could discern that information from the records provided, the court cannot conclude, as a matter of law, that drivers who worked "week after week" necessarily worked "on a regular basis," performed "the same type of work as the Employer's regular employee drivers" and could be controlled in the manner of their work. A showing that drivers worked "week after week" is not sufficient to demonstrate that they are the type of "employee owner-operators" covered by the NMFA. As such, there are factual issues which cannot be resolved by this court at this time, and summary judgment is not appropriate on these alleged "trip lessors."

B.    Proper Rates for Contributions

Steel Express also challenges the contribution rates used by Central States in computing liability on its employees. Steel Express challenges all of Central States' contribution rates because they are drawn from a successor NMFA covering the period of April 1, 1994 to March 31, 1998. Instead, Steel Express argues, the proper contribution rates are those that were in effect during the last year of the 1991-1994 NMFA, $85.00 for the Pension Fund and $111.70 for the Health and Welfare Fund. In response, Central States agrees that the proper contribution rate for the Pension Fund is $85.00, but that it accurately calculated the amount owed to the Health and Welfare Fund. Central States points to two Interim Agreements signed by Central States in which Central States agreed to pay higher rates. The first agreement had an effective date of April 1, 1994, and stated the new contribution rate as $121.70. The second agreement had an effective date of April 1, 1995, and stated a contribution rate of $131.70.

Based on the parties' agreement on the Pension Fund rate and the Interim Agreements signed by Central States, this court finds the proper contribution rates to be as follows. The Pension Fund rate is $85 for all years covered by the audit and this litigation. The Health and Welfare Fund rate is $111.70 for January 1, 1994 to March 31, 1994, $121.70 for April 1, 1994 to March 31, 1995, and $131.70 for all times after April 1, 1995. The parties should re-calculate the amounts owing on those drivers whom this court has found that Steel Express owes contributions accordingly.

## CONCLUSION

For the reasons stated, plaintiff Central States' motion for summary judgment is GRANTED as to Steel States' liability for contributions on behalf of employees beyond March 31, 1994. Contributions are due on behalf of those drivers whom Steel Express classified as employees during the audit period. Summary judgment is also GRANTED as to the contribution rates to be used in assessing Steel Express' liability. Summary judgment is DENIED as to Steel Express' liability for those drivers classified as "permanently leased" and "trip lessors." The remaining issues in this litigation are: 1) whether contributions are due on behalf of those drivers classified as "permanently leased" and/or "trip lessors"; 2) the amount of contributions, if any, due on behalf of those drivers, and 3) the total amount of contributions due from Steel Express, including interest and costs. The parties are strongly urged to discuss settlement of their differences. This case is set for report on status on May 11, 2000 at 10:00 a.m.

ENTER:

JAMES F. HOLDERMAN
United States District Judge

DATE: April 18, 2000

23